# EXHIBIT 1

Kenneth A. Sansone (SBN 319982)
Seth D. Mansergh (SBN 274892)
**SL ENVIRONMENTAL LAW GROUP, PC**
175 Chestnut Street
San Francisco, CA 94133
(415) 348-8300; Fax: (415) 348-8333
aleff@slenvironment.com
smansergh@slenvironment.com
ksansone@slenvironment.com

Daniel S. Robinson (SBN 244245)
Michael W. Olson (SBN 312857)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com
molson@robinsonfirm.com

Andrew W. Homer (SBN 259852)
**KELLEY DRYE & WARREN LLP**
7825 Fay Avenue, Suite 200
La Jolla, CA 92037
(858) 795-0426
ahomer@kelleydrye.com

(Exempt from filing fees
per Govt. Code §6103)

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| CITY OF CORONA and CORONA UTILITY AUTHORITY, <br><br> Plaintiffs, <br><br> vs. <br><br> 3M COMPANY, E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, CORTEVA, INC., DUPONT DE NEMOURS, INC.; DECRA ROOFING SYSTEMS, INC.; AND DOE DEFENDANTS 1-49, inclusive, <br><br> Defendants. | Case No.: CVRI2100800 <br><br> THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF AND DEMAND FOR JURY TRIAL: <br> (1-2) STRICT PRODUCTS LIABILITY (DESIGN DEFECT); <br> (3-4) STRICT PRODUCTS LIABILITY (FAILURE TO WARN); <br> (5-6) TRESPASS; <br> (7-8) PUBLIC AND PRIVATE NUISANCE; <br> (9-10) NEGLIGENCE; <br> (11) DECLARATORY RELIEF; AND <br> (12-15) FRAUDULENT AND VOIDABLE TRANSFER <br><br> JURY TRIAL DEMANDED |

Plaintiffs City of Corona and Corona Utility Authority hereby allege, based on information and belief and investigation of counsel:

- 1 -
THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

## SUMMARY OF THE CASE

1. Plaintiff the City of Corona (the "City") owns, operates, and controls a water enterprise that provides drinking and other water to residents, businesses, and others in and around Corona, California (collectively the "Service Area"). City also owns, operates, and controls a wastewater enterprise that provides wastewater treatment services within the Service Area. City leases the water enterprise and wastewater enterprise ("Water System") to Plaintiff Corona Utility Authority (the "CUA"), a joint powers authority, duly organized and existing under the laws of California. The CUA has contracted with the City to appoint and retain the City as the manager and operator of the Water System.

2. Plaintiffs bring this action to recover the substantial costs necessary to protect the public and restore several of City's water supply wells, located in Corona, California, which are contaminated with synthetic per- and polyfluoroalkyl substances ("PFAS") perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), and perfluorobutanesulfonic acid ("PFBS") to recover costs associated with the contamination of drinking water, surface water, and groundwater with PFAS, to seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminate the surface water and aquifers that supply the drinking water for Plaintiffs do not present a risk to the public. In this Third Amended Complaint, the terms PFAS, PFOS, PFOA, and PFBS are intended to include those compounds themselves (including all of their salts and ionic states as well as the acid forms of the molecules) and their chemical precursors.

3. PFAS are persistent, toxic, and bioaccumulative compounds when released into the environment. PFAS have impacted surface water and groundwater, and now contaminate the water pumped from Plaintiffs' water supply wells. Because of the risks that PFAS pose to human health, the State of California regulates PFOA, PFOS, and PFBS in drinking water at very low levels. The State of California has established notification levels for PFOS of 6.5 parts per trillion ("ppt"), for

4. PFOA of 5.1 ppt, and PFBS of 500 ppt, with response levels for PFOS of 40 ppt,

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

for PFOA of 10 ppt, and for PFBS of 5,000 ppt.[1] Defendants are companies that designed, manufactured, marketed, distributed, sold and/or used PFAS, the chemical precursors of PFAS, and/or products containing PFAS, and/or their chemical precursors. Defendants made products with PFAS including but are not limited to, Teflon®, Scotchguard®, waterproofing compounds, stain-proofing compounds, waxes, paper and cloth coatings, aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires, and fluorosurfactants used in the manufacture of AFFF as well as telomer building blocks used to make fluorosurfactants that were then used to manufacture other PFAS-containing products, including AFFF. Collectively, defendants' PFOA, PFOS, precursors, products containing PFAS, AFFF, and other products and intermediates containing PFAS are referred to herein as "Fluorochemical Products."

5.    Defendants designed, manufactured, marketed, distributed, stored, sold, and/or used Fluorochemical Products with the knowledge that these toxic compounds would be released into the environment during fire protection, fire training, and response activities, even when used as directed and intended by defendants.

6.    Defendants were also aware that their Fluorochemical Products would be and have been used, released, stored, and/or disposed of at, near, or within the vicinity of Plaintiffs' impacted wells such that PFAS, and their chemical precursors would enter the environment, migrate through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating the water that supplies Plaintiffs' wells.

7.    As a result of the use of defendants' Fluorochemical Products for their intended purpose, PFAS, and/or their chemical precursors have been detected in Plaintiffs' Contaminated Wells at levels exceeding California's regulatory advisories.

---

[1] The State of California has been tracking and is likely to regulate additional PFAS, including PFHxS, PFHxA, PFNA, PFDA, and ADONA. Since suit was filed, the State of California established notification and response levels for PFBS. (https://oehha.ca.gov/media/downloads/water/chemicals/nl/pfbsnl121820.pdf ) (last accessed May 20, 2021). Everywhere this Third Amended Complaint identifies PFOS, PFOA, PFBS, or PFAS, these references should be read to also include, as applicable, any other analytes as California begins to regulate them.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

8.     Defendants knew or reasonably should have known that PFAS compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten public health and welfare.

9.     Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M"), E. I. du Pont de Nemours and Company ("Old DuPont"), and the Chemours Company ("Chemours") (together 3M, Old DuPont, and Chemours are referred to as the "Manufacturing Defendants") are major chemical companies that manufactured PFOS and/or PFOA and/or PFBS and/or PFAS-containing products and knew or reasonably should have known that these harmful compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare.

10.    Defendant 3M also operates a manufacturing facility at 18750 Minnesota Road, Corona, California ("3M Corona Facility"), which occupies approximately 1,300 acres of land in the Temescal Canyon and, upon information and belief, is a source of PFAS that has reached certain of Plaintiffs' drinking water wells. According to its website, 3M acquired the Corona site from the Blue Diamond Company in 1941, commenced its own manufacturing activities at that site in 1948, and produces specialty roofing granules to the asphalt and metal roofing shingle industries. Plaintiffs believe that 3M has owned and operated the 3M Corona Facility continuously at all times since acquiring it. Plaintiffs also believe that 3M's operations at the 3M Corona Facility have included the manufacture and/or use of PFOS/PFOA and/or their precursors.

11.    Defendant DECRA Roofing Systems, Inc. ("DECRA") is a California corporation that caused and/or contributed to the PFAS contamination as further described below and knew or reasonably should have known that these harmful compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare. Defendant DECRA maintains a manufacturing facility at 1230 Railroad Street, Corona, California 92882 and a warehousing, shipping, and receiving facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882 (together "DECRA Corona Facilities"). Defendant DECRA purchases specialty roofing granules from the 3M Corona Facility (and others) and then incorporates those 3M specialty roofing granules, which, upon information

and belief, include PFAS ingredients (among others including Scotchgard® coatings and polymer coatings), into its roofing products ("DECRA Roofing Products") that are manufactured and warehoused at, then shipped from the DECRA Corona Facilities to customers throughout Plaintiffs' respective service areas. Based on DECRA's participation in 3M's manufacturing chain of commerce and distribution, as well as how DECRA's own manufacturing, storage, movement, handling, and disposal of PFAS-containing DECRA Roofing Products have caused contamination of ground and surface water with PFAS, DECRA is also strictly liable for the damages Plaintiffs seek.

12.     Plaintiffs file this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiffs for the costs of investigating and remediating the contamination of surface water and groundwater impacted by PFOA, PFOS, and PFBS, designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA, PFOS, and PFBS from public water supplies, and for such other damages and relief the Court may order.

13.     In addition, Plaintiffs assert claims under the former Uniform Fraudulent Transfer Act, formerly California Civil Code Section 3439, *et seq.* ("UFTA") and the superseding Uniform Voidable Transactions Act, California Civil Code Section 3439, *et seq.* ("UVTA"), based on a web of transactions that Old DuPont orchestrated to shield significant assets from the Plaintiffs and other creditors.

14.     Old DuPont has known for decades that it faces unprecedented liabilities for widespread PFAS contamination throughout the country, including, but not limited to, damage to public water systems, drinking water sources, and other natural resources. Despite this knowledge, Old DuPont has sought, and continues to seek, however possible, to prevent injured public water systems like those that Plaintiffs own and operate from being able to recover on their eventual judgments.

15.     Old DuPont has sought to limit its PFAS liability by engaging in a series of complex restructuring transactions, including, but not limited to (i) the "spinoff" of its performance chemicals business (which included Teflon and other products, the manufacture of which involved

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

the use of PFOA and other PFAS) into defendant Chemours; (ii) a purported merger with The Dow Chemical Company ("Old Dow"); (iii) the transfer of Old DuPont's historic assets to other entities, including defendant DuPont de Nemours Inc. ("New DuPont"); and (iv) ultimately, the spin-off of Old DuPont to a new parent company named Corteva, Inc. These transactions were all designed to shield billions of dollars in assets from the PFAS liabilities that Old DuPont tried to isolate in Chemours.

16.    Old DuPont also sought to hide critical details of these transactions by burying them in non-public schedules to agreements in an attempt to keep the parties such as Plaintiffs in the dark. As a result, Old DuPont has shed more than $20 billion in tangible assets through restructuring efforts and attempted to put those assets outside of Plaintiffs' reach. This is the exact type of scheme that the UFTA and UVTA are designed to prevent and/or unwind.

## THE PARTIES

17.    City of Corona is a California municipality. It owns and operates a water system for the benefit of the public, which includes, among other elements, drinking water production wells which draw from one or more groundwater aquifers, associated pumping, storage, treatment and distribution facilities and equipment, all of which will be referred to collectively in this Third Amended Complaint as Plaintiffs' "Water System." City provides potable water through its Water System to residents and businesses in and around the Service Area. Among other things, City's Water System includes the right of City to extract and use groundwater for drinking water supplies from its wells. City has a significant property interest in the waters it extracts and uses from its wells. The past, present, and continuing contamination of such waters by PFOA, PFOS, and/or PFBS constitutes physical injury to such waters for which City is entitled to, and City hereby does, seek damages and other appropriate relief.

18.    Defendants' Fluorochemical Products, including but not limited to PFAS containing fluorochemicals/intermediates and AFFF were applied directly to the environment at times within and/or in reasonable proximity to Plaintiffs' Service Area and/or to Plaintiffs' Water System, such that those compounds traveled by stormwater, surface water, groundwater, and other pathways toward and contaminated Plaintiffs' drinking water supplies. Defendants'

- 6 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Fluorochemical Products were also used and disposed of in and around the Service Area, including at nearby landfills such that surface, groundwater, and other pathways caused PFAS to contaminate Plaintiffs' drinking water supply. Finally, Defendants' Fluorochemical Products have been used and disposed of into wastewater systems, causing contamination to the recycled wastewater system and stormwater, surface water and groundwater in the Service Area that contaminated Plaintiffs' drinking water supplies.

19. Defendant 3M Company ("3M") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

    a. Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold Fluorochemical Products. 3M manufactured, distributed, and sold AFFF containing PFOS. 3M was the only company that manufactured or sold AFFF containing PFOS.

    b. 3M has also researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold products and raw materials containing PFAS in markets around the country, including within California, since at least the 1970s. These product and raw material sales were based on intentional direction at the California market for these products and raw materials and availment of California laws.

    c. 3M also operates a facility in Corona, California ("3M Corona Facility"), which occupies 1,300 acres of land in the Temescal Canyon. According to its website, 3M acquired the 3M Corona Facility in 1941 and began manufacturing there in 1948. Based on information and belief, 3M has additional facilities in Irvine, California; Monrovia, California; and Northridge, California.

    d. 3M does business throughout the United States, including conducting business in California, and is registered to do business in California.

20. Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located

at 974 Centre Road, Wilmington, Delaware 19805.

    a.   Old DuPont has been involved in the production and sale of fluorochemical intermediaries for use in AFFF manufacturing since the 1950s. When 3M left the market, Old DuPont took on a larger role in the AFFF market.

    b.   Old DuPont has also manufactured, distributed, and sold Fluorochemical Products and raw PFAS chemicals around the country pursuant to a nationwide marketing campaign, including in California.

    c.   Also on information and belief, Old DuPont was engaged in joint ventures and other business arrangements with California entities for the development of Fluorochemical Products.

    d.   Old DuPont has done business throughout the United States, including conducting business in California, and is registered to do business in California.

21.    Defendant The Chemours Company ("Chemours") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont completed its spin-off of Chemours as a separate publicly-traded entity. In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in California, around the country and indeed the world.

    a.   Chemours has received and begun manufacturing certain product lines from Old DuPont, including some product lines involving manufacture, sale, and distribution of PFAS-containing intermediates and products.

    b.   Chemours does business throughout the United States, including conducting business in California, and is registered to do business in California.

22.    Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

23.    New DuPont does business throughout the United States, including conducting

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1   business in California.

2          24.    Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws

3   of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut

4   Run Plaza 735, Wilmington, Delaware 19805.

5          25.    Corteva does business throughout the United States, including conducting business

6   in California, and is registered to do business in California.

7          26.    Defendant DECRA Roofing Systems, Inc. ("DECRA") is a corporation duly

8   organized under the laws of the State of California, with its principal place of business located at

9   1230 Railroad Street, Corona, California 92882. In addition to maintaining its principal place of

10  business at the same address, Defendant DECRA also maintains a manufacturing facility at 1230

11  Railroad Street, Corona, California 92882, as well as a warehousing, shipping, and receiving

12  facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882.  DECRA

13  has owned and/or operated its manufacturing, warehousing, shipping, and receiving facilities at

14  the addresses listed above since at least 1998, and as early as 1989 when it was operating under

15  the            tradename            "Tasman            Roofing,            Inc."

16  http://web.archive.org/web/20010411164609/http://www.decra.com/aboutus/index.html         (last

17  accessed May 20, 2021). In addition, DECRA began selling roofing products in Southern

18  California by the early 1980s, at the latest, through an exclusive California distributor.

19         27.    Defendant DECRA engaged in business with 3M to order, purchase, and/or

20  otherwise obtain specialty roofing granules manufactured at the 3M Corona Facility, for use in

21  DECRA Roofing Products containing PFAS, which, on information and belief, were installed in

22  homes and structures and/or eventually discarded in or around the City.

23         28.    Defendant DECRA's website represents that "[w]e use only 3M granules."  During

24  the time DECRA has been operating at its Corona Facility, under its current name and its prior

25  tradename, 3M used PFAS in the manufacturing of 3M's roofing granules, including granules sold

26  to DECRA for use in DECRA's Roofing Products. DECRA therefore participates in the chain of

27  distribution and stream of commerce of roofing materials containing PFAS, which are ultimately

28  released to the environment, where they contaminate Plaintiffs' water supply.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

29.    According to Defendant 3M's website, "3M produces the granules, but it's the shingle manufacturers who create the shingles that you see on homes and commercial buildings across the country. 3M is honored to partner with multiple shingle manufacturers across the country, allowing us to provide hundreds of shingle options so that homeowners are certain to find a shingle to suit their home. Check out our manufacturers' websites below to learn more about the vast number of shingle and roofing options available! Manufacturers using 3M granules: […] DECRA." (https://www.3m.com/3M/en_US/roofing-granules-us/resources/, last accessed May 20, 2021).

30.    Based on evidence that one of the principal products that 3M manufactured at its Corona facilities was roofing granules, and that 3M's Corona facilities have been a substantial source of releases of PFAS, the roofing granules manufactured by 3M at its Corona facilities, and used by DECRA at its Corona facilities to make its Roofing Products, contained PFAS.

31.    Based on information and belief, PFAS from DECRA's Roofing Products have been and continue to be released to the environment and to contaminate Plaintiffs' water supply in at least four ways: (a) through the use and disposal of PFAS-containing 3M roofing granules at DECRA's Corona manufacturing facility; (b) through the handling and storage of PFAS-containing DECRA Roofing Products at DECRA's Corona warehousing facility; (c) through stormwater that includes runoff that comes in contact with PFAS-containing DECRA Roofing Products installed within or hydrologically upgradient of the Plaintiffs' water production facilities; and (d) when PFAS-containing DECRA Roofing Products are disposed of in solid waste landfills within or hydrologically upgradient of Plaintiffs' water production facilities.

32.    Based on information and belief, PFAS were historically released to the environment from DECRA's manufacturing and warehouse facilities in Corona during the manufacturing, finishing, handling, storage, shipping, and receiving of PFAS-containing DECRA Roofing Products and associated materials carried out at that facility. Defendant DECRA is registered with the California State Water Resources Control Board as "discharger" of pollutants via stormwater, with Waste Discharger Identification Number 8 33NEC006524, covered under and subject to a statewide Industrial General Permit governing such discharges under the Federal

- 10 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Water Pollution Control Act ("Clean Water Act," 33 U.S.C. §§ 1251-1387). The "Subwatershed Name" associated with this Defendant DECRA's Railroad Avenue manufacturing facility is "Temescal Wash," which is the name assigned to Temescal Creek on federal maps used by the United States Environmental Protection Agency.[2] PFAS are not currently regulated under the Clean Water Act, so Defendant DECRA is not currently required to monitor for or report PFAS in its stormwater discharge to Temescal Creek, and Plaintiffs have not been able to locate existing public data reflecting PFAS sampling and analysis for that discharge. On information and belief, stormwater that in the past came or currently comes into contact with PFAS-containing products or materials, or PFAS-impacted soil, at Defendant DECRA's Railroad Avenue manufacturing facility has transported PFAS from the facility to Temescal Creek, the Santa Ana River, and their alluvial streams, and also into Plaintiffs' water supply by way of stormwater runoff from DECRA's facilities that is absorbed into the surrounding soil and ultimately reached Plaintiffs' groundwater supplies.

33.    Once released to the environment, PFAS from DECRA's Corona Facilities have contaminated the groundwater and surface water beneath and nearby those facilities, including but not limited to via aerial deposition and stormwater runoff that ultimately migrates to and contaminates Plaintiffs' water supply. Based on information and belief, PFAS-containing DECRA Roofing Products, made prior to 3M's claimed "phase-out" of PFOS and after 3M began using PFBS as a replacement for PFOS, were installed on buildings within or hydrologically upgradient of Plaintiffs' water production facilities. Rainwater that comes into contact with such installed DECRA Roofing Products is likely to include PFAS, and such runoff is captured and diverted as stormwater to various receiving waters and areas that ultimately migrate to and contaminate Plaintiffs' water supply.

34.    Based on information and belief, PFAS-containing DECRA Roofing Products, including those made prior to 3M's claimed "phase-out" of PFOS and after 3M began using PFBS

---

[2] See: https://edits.nationalmap.gov/apps/gaz-domestic/public/summary/274063 (accessed May 21, 2022).

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

as a replacement for PFOS, have been and continue to be disposed in solid waste landfills within or hydrologically upgradient of the Plaintiffs' water production facilities. Landfill leachate that is released to groundwater from such solid waste landfills ultimately migrates to and contaminates Plaintiffs' water supply.

35.    Due to the well-documented persistence of PFAS in the environment (discussed in more detail below), PFAS released during the manufacture, storage, shipping, and other handling of PFAS-containing DECRA Roofing Products at DECRA's Corona Facilities, through contact with installed DECRA Roofing Products in and around the geographic area of Plaintiffs' water supply.

36.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names and capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 49, inclusive, were unknown to Plaintiffs at the time of original filing of the Original Complaint in this action and the filing of this Third Amended Complaint and, therefore sues said Defendants by fictitious names.

37.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the true names or capacities, whether individual, corporate, otherwise, of Defendants DOES 1 through 100, inclusive, remain unknown to Plaintiffs and, therefore Plaintiffs sue said Defendants by such fictitious names. Plaintiffs are informed and believe and based thereon allege that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused the damages proximately and foreseeably to Plaintiffs as alleged herein.

38.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, all of said Defendants herein, including the named Defendants, and DOES 1 through 49, inclusive, are collectively referred herein as "Defendants," "Manufacturing Defendants," and/or Defendant DECRA and all acts and omissions of said Defendants were undertaken by each of the Defendants and said Defendants' agents, servants, employees, and/or owners, acting in the course and scope of its respective agencies, services, employments, and/or ownerships.

///

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over this action pursuant to California Code of Civil Procedure § 410.10.

40.     This Court has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products, including but not limited to AFFF, to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the State of California for active use including, but not limited to, during the course of firefighting activities, including areas within Plaintiffs' Water System.

41.     Venue is proper in this Court because Plaintiffs are located in Riverside County and the violations of law alleged herein occurred in Riverside County.

42.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Manufacturing Defendants engaged in and were authorized to do business in the state of California.

43.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Manufacturing Defendants have engaged in substantial, continuous economic activity in California, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS, and that said activity by the Manufacturing Defendants is substantially connected to the Plaintiffs' claims as alleged herein.

44.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, one or more of the Manufacturing Defendants named by Plaintiffs is a California corporation incorporated under the laws of the State of California, and/or has its principal place of business in this State, and was an integral part of the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, PFBS and/or products

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

that contain PFOS and/or PFOA and/or PFBS, and that said activity is substantially connected to the Plaintiffs' claims as alleged herein.

45.      Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, one or more of the Defendants named by Plaintiffs are California corporations incorporated under the laws of the State of California, and/or have their principal places of business in this State, and were in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS, and that said activity is substantially connected to the Plaintiffs' claims as alleged herein.

46.      Based on information and belief, the Manufacturing Defendants purposefully affiliated themselves with the forum of the State of California giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of California are believed to include, but are not limited to, 1) the Manufacturing Defendants' contractual relationships with the entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS, and that said activity is substantially connected to the Plaintiffs' claims as alleged herein.; 2) agreements between the Manufacturing Defendants and entities, institutions and thought leader academics within State of California regarding the PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS where the Manufacturing Defendants contractually consented to have state courts within the State of California adjudicate disputes; 3) marketing, advertising, selling, and advising third-party sellers of, the PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS, targeted specifically to consumers and businesses within the State of California; 4) lobbying, consulting, and advisory efforts on behalf of the Manufacturing Defendants with regard to the PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS stemming from law firms and other agents in the State of California; and 5) and other actions by Defendants targeted to the State of

- 14 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

California to be obtained through discovery and other means. As the location from which the
Manufacturing Defendants' suit-related conduct arose, California has a substantial vested interest
in the acts of the Manufacturing Defendants which led to the underlying controversy.

47.     At all times herein mentioned, the Manufacturing Defendants, each of them, had
actual knowledge that each of the other Defendants was going to intentionally and negligently
engage in the tortious misconduct and acts alleged in the causes of action set forth in this Third
Amended Complaint, including but not limited to the acts, failures to act, misrepresentations and
breaches of duties of care owed by each of the Manufacturing Defendants to Plaintiffs.

## BACKGROUND AND FACTUAL ALLEGATIONS
## THE PFAS COMPOUNDS

48.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

49.     PFAS have been prevalently used for decades in industrial settings and in the
production of thousands of common household and commercial products that are heat resistant,
stain resistant, long lasting, and water and oil repellant.

50.     The PFAS family of chemicals are entirely anthropogenic and do not exist in nature.

51.     PFOA, PFOS, and PFBS are PFAS that are known to have characteristics that cause
extensive and persistent environmental contamination.

52.     Specifically, PFOA, PFOS, and PFBS are persistent, toxic, and bioaccumulative as
well as mobile.

53.     PFOA, PFOS, and PFBS are mobile in that they are soluble and do not easily adsorb
(stick) to soil particles.

54.     PFOA, PFOS, and PFBS are readily transported through the air as well as the soil
and into groundwater where they can migrate long distances.

55.     PFOA, PFOS, and PFBS are persistent in that they do not readily biodegrade or
chemically degrade in the environment or in conventional treatment systems for drinking water or
wastewater.

56.     PFOA, PFOS, and PFBS are thermally, chemically, and biologically stable in the
environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and

1   hydrolysis.

2        57.    Once these PFAS compounds are applied, discharged, disposed of, or otherwise

3   released onto land or into the air, soil, sediments, or water, they migrate through the environment

4   and into groundwater and surface water.

5        58.    These compounds resist natural degradation and are difficult and costly to remove

6   from soil and water.

7        59.    PFOA, PFOS, and PFBS bioaccumulate, biopersist, and biomagnify in the food

8   web including in people and other organisms.

9        60.    Exposure to certain PFAS has been associated with several negative health

10  outcomes in both humans and animals, including, but not limited to, the following:

11              a.    Altered growth, learning, and behavior of infants and older children;

12              b.    Lowering a woman's chance of getting pregnant;

13              c.    Interference with the body's natural hormones;

14              d.    Increased cholesterol levels;

15              e.    Modulation of the immune system;

16              f.    Increased risk of certain cancers; and

17              g.    Increased risk of ulcerative colitis.

18       61.    Contamination from PFOS and/or PFOA and/or PFBS presents a threat to public

19  health and the environment.

20       62.    In addition to drinking contaminated water, humans can be exposed to PFOA,

21  PFOS, and PFBS through inhalation, ingestion of contaminated food, and dermal contact.

22       63.    PFOA, PFOS, and PFBS enter the environment from industrial facilities that use

23  PFAS in the manufacture or production of other products.

24       64.    Releases to land, air, and water from industrial sites are known pathways to the

25  environment.

26       65.    PFOA, PFOS, and PFBS may also enter the environment from wastewater

27  treatment facilities and also when released from PFAS-containing consumer and commercial

28  products during their use and after they have been disposed to landfills or in any other manner.

- 16 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

66.     PFOA, PFOS, and PFBS may also enter the environment when released from PFAS-containing consumer and commercial products during their use, and after they have been disposed.

67.     On information and belief, ordinary stormwater flows transport PFAS that have been released into the environment from these various pathways of contamination, including landfills and industrial sites where PFAS or products containing them have been used, stored, or disposed, like Defendant DECRA's facilities described herein, to surface water and groundwater in and around the City.

68.     The California State Water Resources Control Board has concluded that, among the "major sources of PFAS" are: industrial sites, landfills, and wastewater treatment plants/biosolids. It elaborates: "PFAS can get into drinking water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in groundwater, PFAS are easily transported large distances and can contaminate drinking wells. PFAS in the air can also end up in rivers and lakes used for drinking water."

 (https://www.waterboards.ca.gov/pfas/background.html#collapseFour) (last accessed Feb. 1, 2021).

69.     For example, the State Water Resources Control Board has investigated landfills as potential sources of PFAS contamination, concluding that "investigation is necessary at and around landfills statewide to determine the presence of PFAS, their respective levels in leachate and groundwater, and to evaluate the impact of current and historic discharges from these facilities on groundwater quality," clearly indicating that within California, PFAS contamination is of concern near landfills, prompting the State to sample the same.[3] Landfills within the City include the closed "Corona Sanitary Landfill," which was in close proximity to and likely used for disposal of used or discarded industrial materials from both the 3M Corona Facility and Defendant DECRA's facilities within the City during its period of operation. According to the California State Water

---

[3] https://www.waterboards.ca.gov/pfas/docs/landfill_pfas_13267_go_03202019.pdf (last accessed May 20, 2021).

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Resources Control Board, the Corona Sanitary Landfill sits within the "Santa Ana River – Middle Santa Ana River – Temescal" watershed, was physically located in close proximity to Temescal Creek, and the landfill accepted more than 3,200,000 tons of waste between 1951 and 1986. (https://geotracker.waterboards.ca.gov/profile_report?global_id=L10005490322)(accessed May 21, 2014). The Corona Sanitary Landfill is also located in close proximity to several of the City's wells where PFAS has been detected.

70.    The State Water Resources Control Board has also concluded that PFAS are "expected to pass through conventional [stormwater] pretreatment" systems, such that they can be discharged to the environment when wet weather causes stormwater to flow from industrial facilities.[4]

71.    In the same way that PFAS are released from consumer products through their disposal in landfills and stormwater discharges from industrial facilities, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchgard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, and through use of PFAS-containing cook wear, including Teflon®.

72.    Also, on information and belief, the Manufacturing Defendants, sold PFAS and/or PFAS-containing products to companies with California locations that Manufacturing Defendants knew or should have known would be used and/or disposed of in California.

73.    3M and Old DuPont branded products are sold throughout the United States and inside California based on nationwide marketing campaigns.

74.    On information and belief, Old DuPont (and later Chemours) branded intermediate products, including (for example) coating products are sold to and applied within Riverside County at several different businesses, which coatings would have been applied at and pursuant to Old

---

[4] State Water Resources Control Board, *California Drywell Guidance Research and Recommendations*, Contract Number: 18-083-250, March 31, 2020 at 30 (available at: https://www.waterboards.ca.gov/water_issues/programs/stormwater/storms/docs/drywellguidance.pdf) (accessed May 21, 2022).

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

DuPont's (and later Chemours') instruction and, on information and belief, with training from Old DuPont (and later Chemours).

75.     As discussed further below, both 3M and Old DuPont have operations in California. (https://www.dupont.com/locations.html#North%20America, identifying a Torrance location); https://www.dupont.com/locations/palo-alto-california-dupont-research-development-center.html, identifying a Palo Alto location; https://www.corteva.com/resources/media-center/bay-area-innovation-center-strengthens-rnd-presence.html, identifying a Hayward location). DuPont engages in a research collaboration in California with the California Life Sciences Institute: http://califesciencesinstitute.org/dupont-industrial-biosciences-2/.

76.     This includes retail sales of products resulting from Manufacturing Defendants' intentional marketing activities aimed at California markets as well as Manufacturing Defendants' sales to third parties who ultimately incorporated PFAS compounds into a finished product, which the Manufacturing Defendants knew or should have known would be used and/or disposed of in California.

77.     In each of these circumstances, Manufacturing Defendants have directed PFAS or PFAS-containing products and intermediates to California consumers or businesses for consumption and disposal in California.

78.     All the while, the Manufacturing Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

79.     The Manufacturing Defendants' manufacture, distribution and/or sale of PFOS and/or PFOA and/or PFBS and/or products containing PFOA and/or PFOS and/or PFBS resulted in the release of PFOS and/or PFOA and/or PFBS into the environment.

80.     Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Manufacturer Defendants knew, foresaw, and/or should have known and/or foreseen that PFOS and/or PFOA and/or PFBS would contaminate the environment.

81.     The Manufacturing Defendants knew, foresaw, and/or should have known and/or

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

foreseen that their marketing, promotion, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFOS and/or PFOA and/or PFBS containing materials, including in California, would result in the contamination of the groundwater that is the primary source of water supply for Plaintiffs' public water systems.

82.    The Manufacturing Defendants' products were unreasonably and inherently dangerous and the Manufacturing Defendants failed to warn of this danger.

### 3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS

83.    For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFAS in the United States.

84.    3M is the only known manufacturer of PFOS in the United States.

85.    3M began producing PFOA and PFOS as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

86.    3M produced PFAS by electrochemical fluorination ("ECF") beginning in the 1940s.

87.    ECF results in a product that contains and/or breaks down into compounds containing PFOS and/or PFOA.

88.    3M went on to market and promote PFAS and shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including California. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to California as well as throughout the country for decades until announcing in 2000 that it would cease production of PFOA and PFOS (described in more detail below).

89.    On information and belief, when 3M phased out PFOS, it began using PFBS in its place.

### OLD DUPONT'S USE AND MANUFACTURE OF PFOA

90.    Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the manufacturing process for Old DuPont's name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

91.    Old DuPont has also used PFAS in other name-brand products such as

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Stainmaster®, and manufactured a variety of PFAS-containing products, such as fluorochemical-based surfactants used in AFFF, including through a telomerization process that included, contained, degraded, or broke down into and/or generated PFOA.

92.    Although Old DuPont was fully aware that PFOA was an inherently dangerous and toxic chemical for decades, it produced its own PFAS compounds for use in its manufacturing processes, including the initiation of PFOA production as 3M phased out production of PFOA.

93.    Old DuPont marketed and promoted PFAS, and it shipped PFAS to manufacturers throughout the United States, including California. Old DuPont made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to California as well as throughout the country for decades, including with PFOA, which Old DuPont publicly claimed to have stopped manufacturing in 2013.

### THE IMPACT OF PFAS ON PLAINTIFFS' WATER SYSTEM

94.    PFAS has been detected in varying amounts at varying times in water extracted from certain of Plaintiffs' wells located in the Service Area (referred to herein as the "Contaminated Wells"). PFAS has been detected and/or is present in the Contaminated Wells at levels above the applicable notification levels. The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, in the Contaminated Wells in varying amounts and at varying times has resulted in, and will continue to cause, significant injuries and damages to the Contaminated Wells and Plaintiffs' Water System.

95.    The injuries to Plaintiffs caused by Defendants' conduct as alleged herein constitute an unreasonable interference with, and physical damage to, the limited subterranean supplies of fresh drinking water on which Plaintiffs' Contaminated Wells depend. Plaintiffs' interest in protecting the quality of its limited drinking water supplies constitutes a reason personal for seeking damages sufficient to restore such drinking water supplies to their pre-contamination condition.

### 3M'S KNOWLEDGE OF THE DANGERS OF PFAS

96.    In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

- 21 -

97.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

98.    By the early 1960s, 3M understood that some PFAS are highly persistent in the environment, meaning that they do not degrade.

99.    3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills would leach into groundwater and otherwise enter the environment. A 3M internal memo from 1960 described the company's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

100.    As early as 1963, 3M was aware that its PFAS products were persistent in the environment and would not degrade after disposal.

101.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

102.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

103.    By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

104.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

105.    In 1975, 3M found there was a "universal presence" of at least one form of PFAS in blood serum samples taken from across the United States.

106.    Because PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the near inevitability that its products were a pathway for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally but did not share outside the company.

107.    This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of this PFAS from 3M's products in human blood.

108.    According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for

damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

109.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

110.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

111.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

112.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

113.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

114.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

115.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

116.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

117.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

118.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

119.    A key priority of an internal 3M committee—referred to as the FC Core Team—

- 23 -

was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

120.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

121.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

122.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

123.    According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

124.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

125.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1    participate in the process that 3M has established for the management of [PFAS.] For me, it is

2    unethical to be concerned with markets, legal defensibility and image over environmental safety."

3    126.    In response to pressure from the United States Environmental Protection Agency

4    ("EPA"), 3M began to phase out production of PFOS and PFOS products in 2000.

5    127.    On May 16, 2000, 3M issued a news release asserting that "our products are safe,"

6    citing the company's "principles of responsible environmental management" as the reason to cease

7    production.

8    128.    On the same day as 3M's phase-out announcement, an EPA press release stated:

9    "3M data supplied to EPA indicated that these chemicals are very persistent in the environment,

10   have a strong tendency to accumulate in human and animal tissues and could potentially pose a

11   risk to human health and the environment over the long term."

12   129.    In a memo explaining its decision, EPA stated that PFOS "appears to combine

13   Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

14   130.    3M knew or should have known that through their intended and/or common use,

15   products containing PFAS would very likely injure and/or threaten public health and the

16   environment in California.

17

18                    **OLD DUPONT'S KNOWLEDGE OF THE DANGERS**
                       **OF PFAS AND MOUNTING LIABILITIES**

19   131.    Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA

20   and other PFAS at several facilities in the United States.

21   132.    Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to

22   animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also

23   knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large

24   quantities into the environment from its manufacturing plants, such that hundreds of thousands of

25   people had been exposed to its PFOA, including through public and private drinking water

26   supplies.

27   133.    Old DuPont company scientists issued internal warnings about the toxicity

28   associated with their PFOA products as early as 1961.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

134.    Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

135.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

136.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

137.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

138.    Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

139.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

140.    Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

141.    In fact, Old DuPont had reported in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

142.    While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

143.    By at least 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

144.    By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent.

145.    Old DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

146.    After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

147.    Old DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

148.    Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

149.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

150.    They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."

151.    They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

152.    By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

153.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

154.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

155.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

156.    In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

157.    Old DuPont also promised to phase out production and use of PFOA by 2015.

158.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

159.    Old DuPont and Chemours knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in California.

160.    Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled *Leach, et al. v. E.I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

161.    Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

162.    After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to several serious human diseases, including two types of cancer.

163.    More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia following the final settlement in the *Leach* Action and the findings of the C8 Science Panel.

164.    These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the

United States District Court for the Southern District of Ohio (the "C8 MDL").

165.    Between 2015 and 2016, juries in three bellwether trials in the C8 MDL returned multi-million-dollar verdicts against Old DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their cancers.

166.    As discussed below, Old DuPont required that Chemours both directly assume its historical PFAS liabilities, and also indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

167.    On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C8 MDL.

**OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME
TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS
PFAS LIABILITIES AND HINDER CREDITORS**

168.    By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and that its liability was likely billions of dollars.

169.    These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

170.    In light of this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

171.    Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and Old Dow began discussions about a possible "merger of equals."

172.    Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

173.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

174.    Old DuPont engaged in a three-part restructuring plan, further explained below.

175.    The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly-owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate publicly-traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

176.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

177.    Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit and illegal conduct with regard to PFAS.

178.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

179.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

180.    The net effect of these transactions was to transfer, either directly or indirectly, a

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

substantial portion of Old DuPont's assets to DowDuPont.

181.   The third step involved DowDuPont spinning off two, new, publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

182.   As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

183.   New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

184.   Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Plaintiffs, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

**STEP 1: THE CHEMOURS SPINOFF**

185.   In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

186.   On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

187.   Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals business, and Chemours became a separate, publicly-traded entity (the "Chemours Spinoff").

188.   At the time of the spinoff, the Performance Chemicals business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluorochemicals segments (the "Performance Chemicals Business").

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

189.    The Performance Chemicals Business included the fluoroproducts and chemical solutions businesses that had manufactured, used, and discharged PFOA into the environment.

190.    Prior to the Chemours Spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

191.    On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

192.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

193.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

194.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

195.    Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

196.    At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are set forth in non-public schedules and exhibits to the Chemours Separation Agreement.

197.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

198.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

199.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

200.    In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

201.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment from Washington Works and elsewhere.

202.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

203.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

204.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

205.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

206.    There was no meaningful, arms-length negotiation of the Separation Agreement.

207.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

208.    Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly-owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

209.    Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

210.    It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

211.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

212.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

213.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

214.    Removing Chemours' goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

215.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

216.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

217.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account,

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

**STEP 2: THE OLD DOW/OLD DUPONT "MERGER"**

218. After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

219. Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

220. Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

221. On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

222. To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., *i.e.*, "New DuPont" and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

223. Upon the closing of the DowDuPont Merger, Old Dow merged into one merger

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

224.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

225.    The below image reflects the corporate organization following the "merger":



**STEP 3: THE SHUFFLING, REORGANIZATION, AND TRANSFER OF VALUABLE ASSETS AWAY FROM OLD DUPONT AND SEPARATION OF CORTEVA AND NEW DOW**

226.    Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

227.    While, again, the details of these transactions remain hidden from the Plaintiffs and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

for the conglomerate being split into three, separate, publicly-traded companies.

228.  Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

229.  While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

230.  Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (*i.e.*, New DuPont) retained the Specialty Products Business, and prepared to spin off Corteva and New Dow into separate, publicly-traded companies.

231.  The below graph depicts the structure of DowDuPont after the internal



THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

reorganization and realignment:

232.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow and DowDuPont (*i.e.*, New DuPont) (the "DowDuPont Separation Agreement").

233.    The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

234.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

235.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

236.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including Plaintiffs' claims in this case.

237.    While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the groundwater and surface water within the Plaintiffs' public water systems.

- 39 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

238.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

239.    On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

240.    Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

241.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a pro rata dividend.

242.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

243.    Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.*, New DuPont).

**THE EFFECT OF THE YEARS-LONG SCHEME TO DEFRAUD
PLAINTIFFS AND OTHER CREDITORS AND AVOID FINANCIAL
RESPONSIBILITY FOR LEGACY LIABILITIES**

244.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

245.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But in reality Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

246.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

247.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

248.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

249.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

250.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

251.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

252.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

253.    Old DuPont's financial condition has continued to deteriorate. By end of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

254.    Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

255.    In addition, Plaintiffs cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

256.    Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

257.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

258.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

259.    On or about December 15, 2019, New DuPont agreed to sell the Nutrition and

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Biosciences business to International Flavors & Fragrances for $26.2 billion.

260.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

261.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

262.    Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## MANUFACTURING DEFENDANTS' LIABILITY

263.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times alleged herein, despite such knowledge, Defendants, and each of them, acting through their officers, directors, and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in the Manufacturing Defendants' products and failed to warn the public, including Plaintiffs, that the subject products were inherently dangerous, and that there was an extreme risk of injury and harm occasioned by the inherently dangerous nature of the products and defects inherent in the products. Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the subject products knowing that the public, including Plaintiffs, would be exposed to harm and serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

264.    Plaintiffs are informed and believe and therefore allege that, at all relevant times alleged herein, the Manufacturing Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by the

1  Manufacturing Defendants with willful and conscious disregard for safety, entitling Plaintiffs to

2  exemplary damages under California Civil Code section 3294.

3  **3M AND DEFENDANT DECRA CORONA FACILITIES**

4  265.    As noted in Paragraph 6 above, 3M owns and operates the 3M Corona Facility,

5  which occupies approximately 1,300 acres of land in the Temescal Canyon. According to its

6  website, 3M acquired the Corona site from the Blue Diamond Company in 1941. 3M began

7  manufacturing at that site in 1948.

8  266.    3M's business operations are comprised of four primary business groups: Safety

9  and Industrial, Transportation and Electronics, Health Care, and Consumer. The 3M Corona

10  Facility is part of 3M's Industrial Mineral Products Division, which is within the Safety and

11  Industry business group.

12  267.    The 3M Corona Facility's primary products are colored and specialty ceramic

13  roofing granules for the asphalt shingle industry ("3M Corona Products"). 3M produces significant

14  volumes of these products at the 3M Corona Facility. For example, in 2011 alone, more than 414

15  million pounds of these materials were manufactured at this site.

16  268.    3M currently uses or in the past has used PFAS in the manufacturing of roofing

17  materials and holds several roofing-material patents that incorporate PFAS into the manufacturing

18  process.

19  269.    Downstream from the 3M Corona Facility, surface water and groundwater are

20  contaminated with high levels of PFAS, including PFOS and PFOA.

21  270.    Upstream from the plant, the PFAS concentrations are lower or non-detect.

22  271.    In addition, several of the City's groundwater wells downstream of the 3M Corona

23  Facility, and within close proximity of the DECRA Corona Facilities, are contaminated with

24  PFAS, including but not limited to City wells 7A, 8A, and 17. Based on the close proximity of the

25  DECRA facilities to these PFAS-contaminated wells, and the fact that these PFAS-contaminated

26  wells are not substantially upgradient of the DECRA facilities, i.e., groundwater does not flow

27  away from the wells toward the DECRA facilities, PFAS released from the DECRA facilities

28  would likely have been captured, and will likely continue to be captured, by these PFAS-

- 44 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1    contaminated wells.

2        272.    The image below depicts the Temescal Creek corridor along which the 3M Corona

3    Facility and DECRA Corona Facilities sit. The 3M Corona Facility is indicated on the image by

4    yellow "balloon" markers and the DECRA Corona Facilities are indicated on the image by red

5    "balloon" markers. Certain of the City's PFAS-contaminated Wells are indicated on the image by

6    red pushpins.  Temescal Creek flows roughly southeast to northwest as depicted in these images,

7    so "upstream" of the 3M Corona Facility would be the area depicted outside of the images, below

8    the 3M Corona Facility.



9
10
11
12
13
14
15
16
17
18
19
20
21

22        273.    At all relevant times, 3M failed and/or refused to report, investigate, control, and/or

23    remediate PFAS disposed of, or otherwise released from, 3M's Corona Facility. As a direct and

24    proximate result thereof, Plaintiffs have suffered damages including but not limited to the

25    following:

26        A.    Plaintiffs' surface water, groundwater, and drinking water supplies, along with the

27            reclaimed water and bio-solids products, have become contaminated with PFOS and

28            PFOA;

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

B.    Ponds and related facilities used to percolate effluent from Plaintiffs' water reclamation facilities have become contaminated with PFOS and PFOA;

C.    Plaintiffs face a likely increase in disposal costs for bio-solids products contaminated with PFOS and PFOA; and

D.    Plaintiffs have incurred increased costs of testing their water for PFOS and PFOA.

274.    Despite awareness of the high levels of contamination, 3M failed to determine the extent of the contamination and did not adequately remediate the offsite migration to prevent contamination of drinking water wells or protect human health. 3M and its managing agents have failed and refused to act to prevent contamination of surface water, groundwater, and drinking water supplies with full knowledge that failure to do so would cause contamination of drinking water supplies and property damage.

275.    Defendant DECRA maintains a manufacturing facility at 1230 Railroad Street, Corona, California 92882 and a warehousing, shipping, and receiving facility at an adjacent property at 235 N. Sherman Avenue, Corona, California 92882. Defendant DECRA purchases specialty roofing granules from the 3M Corona Facility and then manufactures those 3M specialty roofing granules, which, upon information and belief, include PFAS ingredients, into its DECRA Roofing Products that are warehoused at, then shipped from Defendant DECRA's Corona, California facilities to customers throughout Plaintiffs' respective service areas. On information and belief, Defendant DECRA's manufacture and storage of PFOA and PFOS-containing roofing materials at the DECRA Corona Facilities has caused or contributed to contamination of Plaintiffs' wells and the groundwaters and aquifers that supply them with PFOA and PFOS, resulting in the damages alleged in this Third Amended Complaint.

**FIRST CAUSE OF ACTION**
**Strict Product Liability Based on Defective Design**
**(By all Plaintiffs against Manufacturing Defendants)**

276.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

277.    The Manufacturing Defendants were engaged in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing,

- 46 -

promoting, marketing, selling, and/or otherwise responsible for PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS, resulting in contamination of the environment, including the groundwater that serves as a water source for Plaintiffs and their customers, thereby causing damage to Plaintiffs.

278.    The Manufacturing Defendants' PFAS products were defective in design and formulation when they left the hands of the Manufacturing Defendants.

279.    When used in a foreseeable manner, the Manufacturing Defendants' products resulted in the spillage, leaching, discharge, disposal, and/or release of PFOA and/or PFOS resulting in contamination of surface water and groundwater.

280.    At all times relevant to this action, the Manufacturing Defendants' PFOA and/or PFOS and/or PFBS and products that contain PFOA and/or PFOS and/or PFBS were defective and inherently dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the benefit of the presence of PFOA and PFOS and/or PFBS, if any, did not outweigh the risk of harm to public health and welfare and the environment posed by the presence of PFOA, PFOS, and PFBS.

281.    As a result of the Manufacturing Defendants' products, Plaintiffs have incurred, are incurring, and/or will continue to incur investigation, sampling, remediation, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the contamination of the surface water, groundwater, drinking water supply and the Plaintiffs' Contaminated Wells.

282.    As a direct and proximate result of the defects previously described, the surface water and groundwater within Plaintiffs' Service Area, including groundwater that serves as the source of water to the Contaminated Wells, is and will continue to be, contaminated with PFOA and/or PFOS and/or PFBS, causing damage to such groundwaters and causing Plaintiffs significant injury and property damage. Restoration, repair, and/or remediation of the property damage alleged herein has required Plaintiffs, and will continue to require Plaintiffs, to incur substantial costs and expenses in an amount to be proved at trial.

283.    The Manufacturing Defendants, when researching, designing, formulating,

- 47 -

handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS and/or PFOA and/or PFBS and/or products containing PFOS and/or PFOA and/or PFBS, anticipated and should have accounted for the foreseeable risks posed by their PFAS products.

284.   The Manufacturing Defendants are strictly, jointly, and severally liable for the damages described in this Third Amended Complaint.

285.   The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Third Amended Complaint would cause injury and damage, including contamination of surface water and groundwater within Plaintiffs' Service Area and the Plaintiffs' public water systems with PFOA, PFOS, and/or PFBS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the surface water, groundwater, drinking water supply and the Plaintiffs' Contaminated Wells. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

**SECOND CAUSE OF ACTION**
**Strict Products Liability Based on Defective Design**
**(By all Plaintiffs against 3M and Defendant DECRA)**

286.   Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

287.   3M's manufacturing activities at the Corona Facility since approximately the 1940s give rise to its liability in this cause of action.

288.   Based on information and belief, 3M's Corona Products have contained and/or do contain PFOS and/or PFOA and/or PFBS, during the time between the 1940s and today.

289.   3M's researching, designing, formulating, handling, disposing, manufacturing,

- 48 -
THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

labeling, using, testing, distributing, promoting, marketing, and selling 3M Corona Products that contain PFOA and/or PFOS and/or PFBS resulted in contamination of the environment, including the groundwater within Plaintiffs' Service Area and that serves as a water source for Plaintiffs and their customers, thereby causing damage to Plaintiffs.

290.    3M's Corona Products were defective in design and formulation when they left 3M's hands.

291.    Based on information and belief, Defendant DECRA has an exclusive relationship with 3M for purchase of roofing granules manufactured by 3M that on information and belief contain PFOS and/or PFOA and/or PFBS, which DECRA incorporates into its own products, warehouses them, and then ships its products throughout Plaintiffs' service areas, making DECRA strictly liable as a member of the manufacturing chain of these defective products.

292.    When used in a foreseeable manner, 3M's Corona Products and DECRA's Roofing Products resulted in the spillage, leaching, discharge, disposal, and/or release of PFOA and/or PFOS and/or PFBS resulting in contamination of surface water and groundwater. Specifically, 3M's Corona Products were incorporated into, among other things, DECRA's Roofing Products, which were both installed on buildings within Plaintiffs' service area and eventually disposed of in landfills, including but not limited to the Corona Sanitary Landfill. Once installed on buildings in Plaintiffs' service area, DECRA's Roofing Products and their included 3M Corona Products came into contact with stormwater, that in turn reported to the Santa Ana River and its tributaries, their respective alluvial streams, and—ultimately—Plaintiffs' water supply. Similarly, when 3M's Corona Products and DECR's Roofing Products were disposed of in landfills in and around the City, they caused PFAS to leach into groundwater and—ultimately—Plaintiffs' water supply.

293.    At all times relevant to this action, 3M and DECRA's PFAS-containing Corona Products and Roofing Products were defective and inherently dangerous to an extent beyond which would be contemplated by the ordinary consumer, and/or benefit of the presence of PFOA and PFOS, if any, did not outweigh the risk of harm to the public health and welfare and the environment posed by the presence of PFOA, PFOS, and/or PFBS.

294.    As a result of the 3M's Corona Products and DECRA's Roofing Products

- 49 -

containing PFOA and/or PFOS and/or PFBS, Plaintiffs have incurred, are incurring, and/or will continue to incur investigation, sampling, remediation, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the contamination of the surface water, groundwater, drinking water supply, effluent discharge, disposal, and Plaintiffs' Contaminated Wells.

295.    As a direct and proximate result of the defects previously described, the surface water and groundwater within Plaintiffs' Service Area, including groundwater that serves as the source of water to the Contaminated Wells, is and will continue to be, contaminated with PFOA and/or PFOS and/or PFBS, causing damage to such groundwaters and causing Plaintiffs significant injury and property damage. Restoration, repair, and/or remediation of the property damage alleged herein has required Plaintiffs, and will continue to require Plaintiffs, to incur substantial costs and expenses in an amount to be proved at trial.

296.    3M, when researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for its 3M Corona Products containing PFOS and/or PFOA and/or PFBS, anticipated and should have accounted for the foreseeable risks posed by their PFAS products.

297.    3M and Defendant DECRA are strictly, jointly, and severally liable for the damages described in this Third Amended Complaint.

298.    3M knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Third Amended Complaint would cause injury and damage, including contamination of surface water and groundwater within Plaintiffs' public water systems with PFOA, PFOS and/or PFBS,. 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the surface water, groundwater, drinking water supply and Plaintiffs'

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Contaminated Wells. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

**THIRD CAUSE OF ACTION**
**Strict Products Liability Based on Failure to Warn**
**(By all Plaintiffs against Manufacturing Defendants)**

299.    Plaintiffs repeat and restate the allegations set for in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

300.    The Manufacturing Defendants were engaged in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise responsible for PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS.

301.    The Manufacturing Defendants represented, asserted, claimed, and warranted that PFOA, PFOS, or PFBS and products containing PFOA, PFOS, PFBS and/or their precursors did not require any different or special handling or precautions to prevent risk and damage to human health and the environment.

302.    Products containing PFOA, PFOS, and/or PFBS manufactured and/or supplied by the Manufacturing Defendants are defective and unreasonably dangerous products.

303.    Despite knowing of the dangers associated with the reasonably foreseeable use of their PFAS products, the Manufacturing Defendants failed to provide adequate or effective warnings of the risks of PFOA, PFOS, PFBS and/or products containing PFOA, PFOS, PFBS and/or their precursors, to users, consumer, intermediaries, regulators, and any other party that could have effectively reduced the risk of harm related to using PFOA and/or PFOS and/or PFBS and products that contain PFOA and/or PFOS and/or PFBS, of the products' character and the care required to use and dispose of the products safely.

304.    PFOA, PFOS, PFBS and/or products containing PFOA, PFOS, and/or PFBS manufactured and/or supplied by the Manufacturing Defendants, were used in a manner in which they were foreseeably intended to be used.

305.    Because of the gravity of the risks and the severity of the harm posed by the

1  Manufacturing Defendants' products, and because of the unique and sophisticated dangers
2  inherent in PFOS and/or PFOA and/or PFBS and/or products containing PFOS and/or PFOA
3  and/or PFBS, the Manufacturing Defendants could and should have taken additional steps to
4  ensure that adequate or effective warnings were communicated    .

5      306.    As a direct and proximate result of the Manufacturing Defendants' acts and
6  omissions as alleged herein, Plaintiffs have suffered monetary losses and damages in amounts to
7  be proven at trial.

8      307.    The Manufacturing Defendants are strictly, jointly, and severally liable for the
9  damages described above.

10     308.    The Manufacturing Defendants knew and/or should have known that it was
11 substantially certain that their alleged acts and omissions described in this Third Amended
12 Complaint would cause injury and damage, including contamination of surface water and
13 groundwater and drinking water supplies with PFOA, PFOS, and/or PFBS. The Manufacturing
14 Defendants committed each of the above-described acts and omissions knowingly, willfully, and
15 with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA,
16 PFOS , and/or PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize
17 profits, in conscious disregard of the probable dangerous consequences of that conduct and its
18 foreseeable impact upon health, property and the environment, including but not limited to surface
19 water and groundwater within Plaintiffs' service area and Plaintiffs' Contaminated Wells.
20 Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient
21 to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances
22 alleged herein.

23                         **FOURTH CAUSE OF ACTION**
                   **Strict Products Liability Based on Failure to Warn**
24                  **(By all Plaintiffs against 3M and Defendant DECRA)**

25     309.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of
26 this Third Amended Complaint as if fully set forth herein.

27     310.    3M's manufacturing activities at the Corona Facility since approximately the 1940s
28 give rise to its liability in this cause of action.

311.    Based on information and belief, Defendant DECRA has an exclusive relationship with 3M for purchase of roofing granules manufactured by 3M that on information and belief contain PFOS and/or PFOA and/or PFBS, which DECRA incorporates into its own products, warehouses them, and then ships its products throughout Plaintiffs' Service Areas, making DECRA strictly liable as a member of the manufacturing chain of these defective products.

312.    Based on information and belief, 3M's Corona Products have contained and/or do contain PFOS and/or PFOA and/or PFBS, during the time between the 1940s and today.

313.    3M was engaged in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for its 3M Corona Products.

314.    On information and belief, 3M represented, asserted, claimed, and warranted that their 3M Corona Products did not require any different or special handling or precautions to prevent risk and damage to human health and the environment.

315.    Products containing PFOA, PFOS, and PFBS manufactured and/or supplied by the 3M are defective and unreasonably dangerous products.

316.    Despite knowing of the dangers associated with the reasonably foreseeable use of their 3M Corona Products, 3M failed to provide adequate or effective warnings of the risks of PFOA and PFOS and/or their precursors, to users, consumer, regulators, and any other party that could have effectively reduced the risk of harm related to using PFOA and/or PFOS and/or PFBS and products that contain PFOA and/or PFOS and/or PFBS, of the products' character and the care required to use and dispose of the products safely.

317.    3M's Corona Products were used in a manner in which they were foreseeably intended to be used.

318.    Because of the gravity of the risks and the severity of the harm posed by the 3M's Corona Products, and because of the unique and sophisticated dangers inherent in PFOS and/or PFOA and/or products containing PFOS and/or PFOA and/or PFBS, 3M could and should have taken additional steps to ensure that adequate or effective warnings were communicated.

319.    As a direct and proximate result of 3M's acts and omissions as alleged herein,

- 53 -

1    Plaintiffs have suffered monetary losses and damages in amounts to be proven at trial.

2    320.    3M and Defendant DECRA—as a member of 3M's Corona Product chain of
3    distribution that also knew or should have known of the dangers associated with the reasonably
4    foreseeable use of the 3M Corona Products incorporated into DECRA's Roofing Products—are
5    strictly, jointly, and severally liable for the damages described above.

6    321.    3M knew and/or should have known that it was substantially certain that the alleged
7    acts and omissions described in this Third Amended Complaint would cause injury and damage,
8    including contamination of surface water and groundwater and drinking water supplies with
9    PFOA, PFOS, and PFBS. 3M committed each of the above-described acts and omissions
10    knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to
11    promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or
12    PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of
13    that conduct and its foreseeable impact upon health, property and the environment, including but
14    not limited to surface water and groundwater within Plaintiffs' service area and Plaintiffs'
15    Contaminated Wells. Therefore, Plaintiffs also request an award of exemplary damages in an
16    amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged
17    herein.

18    **FIFTH CAUSE OF ACTION**
**Continuing Trespass**
19    **(By all Plaintiffs against Manufacturing Defendants)**

20    322.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of
21    this Third Amended Complaint as if fully set forth herein.

22    323.    Plaintiffs hold possessory property rights and interests in various parcels of land
23    that have been contaminated with PFAS.

24    324.    Plaintiffs own, possess, and actively exercise rights to extract and use groundwater
25    drawn from their Contaminated Wells.

26    325.    The Manufacturing Defendants were engaged in the business of researching,
27    designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing,
28    promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, PFBS and/or

- 54 -

products that contain PFOS and/or PFOA and/or PFBS and knew or should have known that the subsequent and foreseeable use and disposal of those compounds and products would contaminate the groundwater and drinking water supply wells. Thus, the Manufacturing Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity, caused noxious and hazardous contaminants and pollutants to enter the surface water, groundwater, and drinking water supply.

326.    PFOA, PFOS and PFBS manufactured and/or supplied by the Manufacturing Defendants continue to be located on or in Plaintiffs' property, and the surface water, groundwater, and drinking water supply within Plaintiffs' Service Area, including the groundwater that supplies water to the Plaintiffs' Contaminated Wells.

327.    Plaintiffs did not, and do not, consent to the trespass alleged herein. The Manufacturing Defendants knew or reasonably should have known that Plaintiffs would not consent to this trespass.

328.    The contamination of Plaintiffs' surface water, groundwater, and wells alleged herein has not yet ceased. PFOA, PFOS, and PFBS continue to migrate into and enter groundwater within Plaintiffs' Service Area and Plaintiffs' Contaminated Wells.

329.    As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, the surface water, groundwater, and drinking water supply have been, and continue to be, contaminated with PFOA, PFOS, and PFBS, causing Plaintiffs significant injury and damage.

330.    As a direct and proximate result of these Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of groundwater within Plaintiffs' Service Area and Plaintiffs' Contaminated Wells in an amount to be proved at trial.

331.    As a further direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs seek the value of the use of their property for the time of the wrongful occupation, the reasonable costs of repair or restoration of all of Plaintiffs' property to

its original condition, costs associated with recovering the possession, any benefits or profits obtained by Manufacturing Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under California Civil Code § 3334 and California law. The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Third Amended Complaint would cause injury and damage, including contamination of drinking water supplies with PFOA, PFOS, and PFBS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including groundwater within Plaintiffs' Service Area and Plaintiffs' Contaminated Wells. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

**SIXTH CAUSE OF ACTION**
**Continuing Trespass – 3M and DECRA Corona Facilities**
**(By all Plaintiffs against 3M and Defendant DECRA)**

332.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

333.    Each of the Plaintiffs holds possessory property rights and interests in various parcels of land that have been contaminated with PFAS.

334.    Plaintiffs own, possess, and actively exercise rights to extract and use groundwater drawn from their Contaminated Wells.

335.    Through the operation, management, and maintenance of the 3M Corona Facility, Defendant 3M intentionally, recklessly, or negligently caused PFAS to enter the surface water, groundwater, and drinking water supply, and 3M knew or should have known that the use and disposal of those compounds and products would contaminate the surface water, groundwater, and drinking water supply. Thus, 3M intentionally, recklessly, negligently or as the result of engaging

- 56 -
THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  in an extra-hazardous activity, was a substantial factor in causing noxious and hazardous
2  contaminants and pollutants to enter the surface water, groundwater, and drinking water supply.

3      336.    PFOA, PFOS, and PFBS released, deposited, or disposed of by 3M at the 3M
4  Corona Facility continues to be located on or in Plaintiffs' property, and the surface water,
5  groundwater, and drinking water supply.

6      337.    Plaintiffs did not and do not consent to the trespass alleged herein. 3M individually
7  knew or reasonably should have known that Plaintiffs would not consent to this trespass.

8      338.    The contamination of Plaintiffs' surface water, groundwater and wells alleged
9  herein has not yet ceased. PFAS continues to migrate into and enter the Plaintiffs' Contaminated
10 Wells, surface water, and groundwater.

11     339.    Based on information and belief, Defendant DECRA's own manufacturing,
12 storage, and distribution of PFAS products from its DECRA Corona Facilities caused and/or
13 contributed to an increase of production and distribution of PFAS-containing products and/or the
14 contamination from the 3M and DECRA Corona Facilities, contributing to the damages the
15 Plaintiffs seek.

16     340.    Based on information and belief, through its operation, maintenance, and
17 management of its facilities in the City, Defendant DECRA intentionally, recklessly, or negligently
18 caused PFAS to enter the surface water, groundwater, and drinking water supply, and 3M knew or
19 should have known that the use and disposal of those compounds and products would contaminate
20 the surface water, groundwater, and drinking water supply by allowing stormwater to come into
21 contact with 3M's Corona Products before, during, and after their incorporation into DECRA's
22 Roofing Products. PFAS-containing stormwater was then discharged to Temescal Creek, the Santa
23 Ana River, their alluvial streams, and—ultimately—Plaintiffs' water supply, including by way of
24 stormwater runoff from DECRA's facilities that is absorbed into the surrounding soil and
25 ultimately reaches Plaintiffs' contaminated wells.

26     341.    As a direct and proximate result of 3M's and Defendant DECRA's acts and
27 omissions as alleged herein, the Plaintiffs' Contaminated Wells and the surface water, and
28 groundwater, have been, and continue to be, contaminated with PFAS, causing Plaintiffs

1  significant injury and damage.

2      342.    As a direct and proximate result of 3M's and DECRA's acts and omissions as

3  alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation,

4  treatment, remediation, monitoring, and disposal costs and expenses related to the contamination

5  of the Plaintiffs' Contaminated Wells, surface water, and groundwater in an amount to be proved

6  at trial.

7      343.    As a further direct and proximate result of 3M's and DECRA's acts and omissions

8  as alleged herein, Plaintiffs seek the value of the use of their property for the time of the wrongful

9  occupation, the reasonable costs of repair or restoration of all of Plaintiffs' property to its original

10 condition, costs associated with recovering the possession, any benefits or profits obtained by

11 Manufacturing Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera*

12 *Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under

13 California Civil Code § 3334 and California law.

14     344.    Defendant 3M knew and/or should have known that it was substantially certain that

15 its alleged acts and omissions described in this Third Amended Complaint would cause injury and

16 damage, including contamination of surface water, groundwater, and drinking water supply with

17 PFAS.

18     345.    Defendant 3M committed each of the above-described acts and omissions

19 knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in

20 conscious disregard of the probable dangerous consequences of that conduct and its foreseeable

21 impact upon health, property, and the environment, including the Plaintiffs' Contaminated Wells,

22 surface water, and groundwater. Therefore, Plaintiffs also request an award of exemplary damages

23 in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances

24 alleged herein.

25              **SEVENTH CAUSE OF ACTION**
                **Public and Private Nuisance**
26      **(By all Plaintiffs against Manufacturing Defendants)**

27     346.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

28 this Third Amended Complaint as if fully set forth herein.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

347.    Plaintiffs are the owners of land, easements, and water rights which permit them to extract groundwater for use in their respective public water systems.

348.    The actions of the Manufacturing Defendants as alleged herein, have resulted in the continuing contamination of the Plaintiffs' Contaminated Wells, surface water, groundwater with PFAS, and Such contamination is a public nuisance as defined in California Civil Code section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. Each Manufacturing Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

349.    The actions of the Manufacturing Defendants constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free use of their property, so as to interfere with the comfortable enjoyment of life or property. The contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater significantly affects, at the same time, a considerable number of people in an entire community.

350.    By its design, the Manufacturing Defendants' PFOA, PFOS, PFBS and products containing PFOA and/or PFOS and/or PFBS, are known by Manufacturing Defendants to contain compounds that will likely be discharged to the environment in a manner that will create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

351.    The Manufacturing Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS and/or PFBS would have on the environment and human health.

352.    The Manufacturing Defendants' conduct was a substantial factor in causing the creation of the nuisance at issue by marketing and promoting the use of PFOA, PFOS, and PFBS in a manner and directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFOA, PFOS, and PFBS improperly and in a manner that Manufacturing Defendants knew or should have known would result in the contamination of the

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Plaintiffs' Contaminated Wells, public water systems, surface water, and groundwater.

353.    The Manufacturing Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiffs as a result of the contamination nuisance described herein. As a result of the Manufacturing Defendants' acts and omissions as alleged herein, the Plaintiffs' Contaminated Wells, surface water, and groundwater have been, and continue to be, contaminated with PFOA, PFOS, and/or PFBS, causing Plaintiffs significant injury and damage. As a result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the PFOA, PFOS, and/or PFBS contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater in an amount to be proved at trial.

354.    Furthermore, as a result of the Manufacturing Defendants' acts and omissions as alleged herein, the contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater constitutes an a continuing public nuisance because it is reasonably abatable and because the groundwater contamination at issue continues to migrate, move, and spread onto, into, across, and through the  aquifer and into Plaintiffs' public water systems, and its impact has thus varied, and continues to vary, over time.

355.    The Manufacturing Defendants have continued and will continue, unless restrained by this Court, to maintain the nuisance by failing to investigate, remove, and remediate the environmental contamination they are responsible for. Unless the Manufacturing Defendants are restrained by order of this Court from continuing their non-responsive course of conduct and failure to abate the contamination they have caused, it will be necessary for the Plaintiffs to commence many successive actions against the Manufacturing Defendants, and each of them, to secure compensation for damage sustained, thus requiring a multiplicity of suits.

356.    The Manufacturing Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFAS that contaminate the aquifers supplying water to the Contaminated Wells do not present a risk to the public.

357.    Plaintiffs have been specially damaged because the Manufacturing Defendants'

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

acts and omissions have unreasonably interfered with, and continue to interfere with, Plaintiffs' use and enjoyment of their property rights, water rights, and public water systems, and have suffered and continue to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS contamination of water supply system.

358.    Plaintiffs did not and do not consent to the public nuisance alleged herein. The Manufacturing Defendants knew or reasonably should have known that Plaintiffs would not consent to this public nuisance.

359.    As a direct and proximate result of the nuisance, Plaintiffs have been damaged within the three years preceding the filing of this lawsuit and are entitled to the compensatory damages alleged herein in an amount to be proven at trial, or to such other appropriate relief as the District may elect at trial, including, but not limited to, equitable relief in the form of an order requiring the Manufacturing Defendants to abate the nuisance.

360.    The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Third Amended Complaint would cause injury and damage, including contamination of the Contaminated Wells, surface water, and groundwater with PFAS.

361.    The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiffs' water supply. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**EIGHTH CAUSE OF ACTION**
**Public and Private Nuisance – 3M and DECRA Corona Facilities**
**(By all Plaintiffs against 3M and Defendant DECRA)**

362.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

363.    Plaintiffs are the owners of land, easements, and water rights which permit them to extract groundwater for use in their respective public water systems and to detain surface water to recharge the groundwater basin.

364.    The operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities have resulted in the continuing contamination of the Plaintiffs Contaminated Wells, surface water, and groundwater by PFAS. Such contamination is a public nuisance as defined in California Civil Code section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. 3M has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

365.    The actions of 3M and DECRA through the operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities constitute a nuisance; in that, the contamination of the Plaintiffs Contaminated Wells, surface water, and groundwater is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free use of their property, so as to interfere with the comfortable enjoyment of life or property. The contamination of the groundwater and public drinking water supply significantly affects, at the same time, a considerable number of people in an entire community.

366.    Defendant 3M and Defendant DECRA were at all relevant times aware that PFAS compounds will likely be discharged to the environment in a manner that will create a nuisance and failed to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

367.    Defendant 3M and Defendant DECRA, through their operation, management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities, knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS would

- 62 -
THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1   have on the environment and human health.

2          368.    Based on information and belief, the actions of DECRA through the operation,

3   management, and maintenance of the DECRA Corona Facilities constitute a nuisance in that the

4   contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater is injurious

5   to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free

6   use of their property, so as to interfere with the comfortable enjoyment of life or property. The

7   contamination of the groundwater and public drinking water supply significantly affects, at the

8   same time, a considerable number of people in an entire community. Defendant DECRA further

9   caused and/or contributed to the increase of production and distribution of PFAS-containing

10  products and/or the contamination from the DECRA and 3M Corona Facilities, contributing to the

11  damages Plaintiffs seek.

12         369.    Defendant 3M and Defendant DECRA, through their operation, management, and

13  maintenance of the 3M Corona Facility and DECRA Corona Facilities, caused or contributed to

14  the creation of the nuisance at issue by releasing or disposing of products and materials containing

15  PFAS in a manner that 3M and DECRA knew or should have known would result in the

16  contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater. Specifically,

17  by failing to properly prevent PFAS from entering the Temescal Creek, the Santa Ana River, their

18  alluvial streams, and—ultimately—Plaintiffs' water supply via stormwater discharges from their

19  facilities, Defendant 3M and Defendant DECRA affirmatively acted in a way that caused the

20  contamination of Plaintiffs' water supply.

21         370.    Defendant 3M's and Defendant DECRA's conduct was a substantial factor is

22  causing the harm suffered by Plaintiffs as a result of the contamination nuisance described herein.

23  As a result of 3M's and DECRA's acts and omissions as alleged herein, the Plaintiffs'

24  Contaminated Wells, surface water, and groundwater have been, and continue to be, contaminated

25  with PFOA and PFOS, causing Plaintiffs significant injury and damage. As a result of 3M's and

26  DECRA's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will

27  continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and

28  expenses related to the PFAS contamination of the Plaintiffs' Contaminated Wells, surface water,

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1    and groundwater in an amount to be proved at trial.

2        371.    Furthermore, as a result of Defendant 3M's and Defendant DECRA's acts and

3    omissions as alleged herein, the contamination of the Plaintiffs Contaminated Wells, surface water,

4    and groundwater constitutes a continuing public nuisance because it is reasonably abatable and

5    because the groundwater contamination at issue continues to migrate, move, and spread onto, into,

6    across, and through the aquifer and Plaintiffs' public water systems, and its impact has thus varied,

7    and continues to vary, over time.

8        372.    Defendant 3M and Defendant DECRA have continued and will continue, unless

9    restrained by this Court, to maintain the nuisance by failing to investigate, remove, and remediate

10    the environmental contamination it is responsible for. Unless the 3M and DECRA are restrained

11    by order of this Court from continuing their non-responsive course of conduct and failure to abate

12    the contamination they have caused, it will be necessary for the Plaintiffs to commence many

13    successive actions against 3M and DECRA, to secure compensation for damage sustained, thus

14    requiring a multiplicity of suits.

15        373.    Defendant 3M and Defendant DECRA are responsible to take such action as is

16    necessary to abate the public nuisance and to take such action as is necessary to ensure that the

17    PFOA and PFOS that contaminate the aquifers supplying water to the Providers' public water

18    systems do not present a risk to the public.

19        374.    Plaintiffs have been specially damaged because Defendant 3M's and Defendant

20    DECRA's acts and omissions, have unreasonably interfered with, and continue to interfere with,

21    Plaintiffs' use and enjoyment of the aquifer and their public water systems and have suffered and

22    continue to suffer significant damages and injuries, including but not limited to, investigation,

23    sampling, remediation, treatment system design, acquisition, installation, operations and

24    maintenance, and other costs and damages related to the contamination of the surface water,

25    groundwater, drinking water supply, effluent discharge, disposal, and Plaintiffs' Contaminated

26    Wells.

27        375.    Plaintiffs did not and do not consent to the public nuisance alleged herein.

28    Defendant 3M and Defendant DECRA knew or reasonably should have known that Plaintiffs

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  would not consent to this public nuisance.

2          376.    As a direct and proximate result of the nuisance, Plaintiffs have been damaged,

3  including but not limited to damages suffered within the three years preceding the filing of this

4  lawsuit and are entitled to the compensatory damages alleged herein in an amount to be proven at

5  trial, or to such other appropriate relief as the District may elect at trial, including, but not limited

6  to, equitable relief in the form of an order requiring Defendant 3M and Defendant DECRA to abate

7  the nuisance.

8          377.    Defendant 3M and Defendant DECRA knew and/or should have known that it was

9  substantially certain that its alleged acts and omissions described in this Third Amended Complaint

10 would cause injury and damage, including contamination of the Plaintiffs' Contaminated Wells,

11 surface water, and groundwater with PFAS.

12         378.    Defendant DECRA maintains a manufacturing facility at 1230 Railroad Street,

13 Corona, California 92882 and a warehousing, shipping, and receiving facility at an adjacent

14 property at 235 N. Sherman Avenue, Corona, California 92882. Defendant DECRA purchases

15 specialty roofing granules from the 3M Corona Facility and then manufactures those 3M specialty

16 roofing granules, which, upon information and belief, include PFAS ingredients, into its DECRA

17 Roofing Products that are warehoused at, then shipped from Defendant DECRA's Corona,

18 California facilities to customers throughout Plaintiffs' respective service areas. On information

19 and belief, Defendant DECRA's manufacture and storage of PFOA and PFOS-containing roofing

20 materials has caused or contributed to contamination of the Plaintiffs' Contaminated Wells and the

21 groundwaters and aquifer that supply them with PFAS, resulting in the damages alleged in this

22 Third Amended Complaint, specifically, by failing to properly prevent PFAS from entering the

23 Temescal Creek, the Santa Ana River, their alluvial streams, and—ultimately—Plaintiffs' water

24 supply via stormwater discharges from their facilities, including by way of stormwater runoff from

25 DECRA's facilities that is absorbed into the surrounding soil and ultimately reaches Plaintiffs'

26 contaminated wells, Defendant DECRA negligently caused the contamination of Plaintiffs' water

27 supply.

28         379.    Defendant 3M committed each of the above-described acts and omissions

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the Plaintiffs' Contaminated Wells, surface water, and groundwater. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

**NINTH CAUSE OF ACTION**
**NEGLIGENCE**
**(By all Plaintiffs against the Manufacturing Defendants)**

380.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

381.    The Manufacturing Defendants had a duty to the Plaintiffs to exercise due care in the researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling and instructions for the use and disposal of PFAS and products containing PFAS.

382.    The Manufacturing Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, disposed, manufactured, labeled, used, tested, distributed, promoted, marketed, sold and/or instructed for use and disposal of PFAS and products containing PFAS and directly and proximately caused PFAS contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater  in an amount to be proved at trial.

383.    The Manufacturing Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, disposed, manufactured, labeled, used, tested, distributed, promoted, marketed, sold and/or instructed for use and disposal of PFAS and products containing PFAS when they knew, or should have known, that PFAS would: (i) be released into the environment from industrial, commercial and consumer uses and sources; (ii) be released and contaminate the Plaintiffs' Contaminated Wells, surface water, and groundwater.

384.    Despite their knowledge that contamination with PFAS was the inevitable

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

consequence of their conduct as alleged herein, the Manufacturing Defendants failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFAS in their product information and/or instructions for use.

385.    As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, the Plaintiffs have suffered monetary losses and damages in amounts to be proven at trial. The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Third Amended Complaint would cause injury and damage, including contamination of the Contaminated Wells, surface water, and groundwater with PFAS.

386.    The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS, PFBS and/or products that contain PFOA and/or PFOS and/or PFBS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiffs' water supply systems. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish the Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

### TENTH CAUSE OF ACTION
### NEGLIGENCE – 3M AND DECRA CORONA FACILITIES
### (By all Plaintiffs against 3M and Defendant DECRA)

387.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

388.    Defendant 3M and Defendant DECRA had a duty to use due care in the handling, control, disposal, release, remediation, and use of PFOS, PFOA, and/or PFBS at and from their Corona Facilities.

389.    Defendant 3M and Defendant DECRA negligently, carelessly, and recklessly handled, controlled, failed to control, disposed, released, remediated or failed to remediate, and used PFOS, PFOA, PFBS and products containing PFOS, PFOA, and/or PFBS that it

- 67 -

contaminated, threatened, and polluted the Plaintiffs' Contaminated Wells and the groundwaters and aquifer that supply them with PFAS, resulting in the damages alleged in this Third Amended Complaint.

390.    3M and DECRA, among other things, negligently, carelessly, and recklessly failed to, and are negligently, carelessly, and recklessly failing to (i) prevent spills, leaks, disposal, discharges and releases of PFAS through the use of appropriate technology; (ii) install and maintain systems to prevent spills, leaks, disposal, discharges, and releases, and facilitate prompt detection and containment of any spills, leaks, disposal, discharges, and releases; (iii) monitor and discover spills, leaks, disposal, discharges, and releases as soon as possible; (iv) warn those who may be injured as a result of spills, leaks, disposal, discharges and releases; and (v) clean up, contain and abate spills, leaks, disposal, discharges, and releases to prevent harm and injury to the Plaintiffs.

391.    3M and DECRA knew, or should have known, that their activities would spill, leak, discharge, and release PFAS into the soil and contaminate surface water and groundwater.

392.    As a direct and proximate result of 3M and DECRA's past and ongoing acts and omissions as alleged herein, Plaintiffs have incurred, including but not limited to within the three years preceding the filing of this lawsuit, are incurring, and will continue to incur, investigation, remediation, treatment, and disposal costs and expenses required to restore groundwater and drinking water resources, and other damages as alleged herein, in an amount to be proved at trial.

393.    3M and DECRA knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Third Amended Complaint would cause injury and damage, including contamination of the Plaintiffs' Contaminated Wells, surface water, and groundwater with PFAS. 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the Contaminated Wells, surface water, and groundwater. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged

1  herein.

2          394.    Defendant DECRA maintains a manufacturing facility at 1230 Railroad Street,

3  Corona, California 92882 and a warehousing, shipping, and receiving facility at an adjacent

4  property at 235 N. Sherman Avenue, Corona, California 92882. Defendant DECRA purchases

5  specialty roofing granules from the 3M Corona Facility and then manufactures those 3M specialty

6  roofing granules, which, upon information and belief, include PFAS ingredients, into its DECRA

7  Roofing Products that are warehoused at, then shipped from Defendant DECRA's Corona,

8  California facilities to customers throughout Plaintiffs' respective service areas. On information

9  and belief, Defendant DECRA's manufacture and storage of PFOA and PFOS-containing roofing

10 materials has caused or contributed to contamination of the Plaintiffs' Contaminated Wells and the

11 groundwaters and aquifer that supply them with PFAS, resulting in the damages alleged in this

12 Third Amended Complaint, specifically, by failing to properly prevent PFAS from entering the

13 Temescal Creek, the Santa Ana River, their alluvial streams, and—ultimately—Plaintiffs' water

14 supply via stormwater discharges from their facilities, including by way of stormwater runoff from

15 DECRA's facilities that is absorbed into the surrounding soil and ultimately reaches Plaintiffs'

16 contaminated wells, Defendant DECRA negligently caused the contamination of Plaintiffs' water

17 supply.

18                        **ELEVENTH CAUSE OF ACTION**
                              **Declaratory Relief**
19   **(By all Plaintiffs against Manufacturing Defendants and Defendant DECRA)**

20         395.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

21 this Third Amended Complaint as if fully set forth herein.

22         396.    The Manufacturing Defendants knew, or should have known, that PFAS, when

23 used in a foreseeable and intended manner, were dangerous and created an unreasonable and

24 excessive risk of harm to human health and the environment.

25         397.    The Manufacturing Defendants intentionally, willfully, deliberately and/or

26 negligently failed to properly handle, control, dispose, and release noxious and hazardous

27 contaminants and pollutants, such that Defendants created substantial and unreasonable threats to

28 human health and the environment, which resulted from the foreseeable and intended use and

1    storage of PFAS and products containing those substances.

2        398.    In addition, Defendant 3M and Defendant DECRA, through their operation,

3    management, and maintenance of the 3M Corona Facility and DECRA Corona Facilities,

4    intentionally, willfully, deliberately and/or negligently failed to properly handle, control, dispose,

5    and release noxious and hazardous contaminants and pollutants, such that Defendants created

6    substantial and unreasonable threats to human health and the environment, which resulted from

7    the foreseeable and intended use and storage of PFAS and products containing those substances.

8        399.    Among other things, Plaintiffs must take costly remedial action to remove PFAS

9    contamination which will result in substantial costs, expenses and damages in an amount to be

10   proved at trial.

11       400.    These Defendants, and each of them, have failed to reimburse Plaintiffs for the cost

12   of investigation, remediation, cleanup, and disposal costs and deny any responsibility or liability

13   for these damages and expenses Plaintiffs will incur in the future.

14       401.    An actual controversy exists concerning who is financially responsible for abating

15   actual or threatened pollution or contamination of groundwater resources, including the aquifer,

16   and Plaintiffs' Contaminated Wells within Plaintiffs' Service Area by PFAS.

17       402.    In order to resolve this controversy, Plaintiffs seek an adjudication of the respective

18   rights and obligations of the parties, and other relief to the extent necessary to provide full relief.

19                              **TWELFTH CAUSE OF ACTION**
20   **California Civil Code Sec. 3439.04(a)(1) (2004) and Delaware Code tit. 6 Sec. 1304(a)(1)**
     **Actual Fraudulent Transfer in Relation to Chemours Spinoff**
21   **(By all Plaintiffs against Old DuPont, Chemours, New DuPont, and Corteva)**

22       403.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

23   this Third Amended Complaint as if fully set forth herein.

24       404.    Plaintiffs seek equitable and other relief pursuant to the UFTA, against Old DuPont

25   and Chemours.

26       405.    Through its participation in the Chemours spinoff, as detailed above, Chemours

27   transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours

28   Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation

1    Agreement (the "Chemours Assumed Liabilities").

2         406.    The Chemours Transfers and Chemours Assumed Liabilities were made for the

3    benefit of Old DuPont.

4         407.    At the time that the Chemours Transfers were made and the Chemours Assumed

5    Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a

6    position to, and in fact did, control and dominate Chemours.

7         408.    Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud

8    creditors or future creditors.

9         409.    Plaintiffs have been harmed as a result of the Chemours Transfers.

10        410.    Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer

11   its assets out of the reach of parties such as the Plaintiffs have been damaged as a result of the

12   actions described in this Third Amended Complaint.

13        411.    Pursuant to the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312 the Plaintiffs

14   seek to avoid the Chemours Transfers and to recover property or value that Chemours transferred

15   to Old DuPont.

16        412.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's

17   liability described above.

18        413.    Plaintiffs further reserve such other rights and remedies that may be available to

19   them under the UFTA as may be necessary to fully compensate the Plaintiffs for the damages and

20   injuries they have suffered as alleged in this Third Amended Complaint.

21                              **THIRTEENTH CAUSE OF ACTION**
         **California Civil Code Sec. 3439.04(5) (2004) and Delaware Code tit. 6 Sec. 1305**
22                    **Constructive Fraudulent Transfer In Relation To Chemours Spinoff**
                   **(By all Plaintiffs against Old DuPont, Chemours, New DuPont, and Corteva)**
23

24        414.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

25   this Third Amended Complaint as if fully set forth herein.

26        415.    Plaintiffs seek equitable and other relief pursuant to the UFTA against Old DuPont

27   and Chemours

28        416.    Chemours  did  not  receive  reasonably  equivalent  value  from  Old  DuPont  in

                                          - 71 -

1    exchange for the Chemours Transfers and Chemours Assumed Liabilities.

2        417.    Each of the Chemours Transfers and Chemours' assumption of the Chemours

3    Assumed Liabilities was made to or for the benefit of Old DuPont.

4        418.    At the time that the Chemours Transfers were made and the Chemours Assumed

5    Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in

6    fact did, control and dominate Chemours.

7        419.    Chemours made the Chemours Transfers and assumed the Chemours Assumed

8    Liabilities when it was engaged or about to be engaged in a business for which its remaining assets

9    were unreasonably small in relation to its business and debt obligations.

10       420.    Chemours was insolvent at the time or became insolvent as a result of the Chemours

11   Transfers and its assumption of the Chemours Assumed Liabilities.

12       421.    At the time that the Chemours Transfers were made and Chemours assumed the

13   Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have

14   believed that it would incur debts beyond its ability to pay as they became due.

15       422.    Plaintiffs have been harmed as a result of the Chemours Transfers.

16       423.    Pursuant the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs seek to

17   avoid the Transfers and to recover property or value transferred to Old DuPont.

18       424.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's

19   liability described above.

20       425.    Plaintiffs further reserve such other rights and remedies that may be available to

21   them under the UFTA and UVTA as may be necessary to fully compensate Plaintiffs for the

22   damages and injuries they have suffered as alleged in this Third Amended Complaint.

23

24                          **FOURTEENTH CAUSE OF ACTION**
     **California Civil Code section 3439.04(a)(1)(2016) and Delaware Code tit. 6 Sec. 1304(a)(1)**
25          **Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and**
              **Subsequent Restructurings, Asset Transfers and Separations**
26            **(By all Plaintiffs against Old DuPont, New DuPont and Corteva)**

27       426.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

28   this Third Amended Complaint as if fully set forth herein.

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

427.    Plaintiffs seek equitable and other relief pursuant to the UVTA against Old DuPont, New DuPont, and Corteva.

428.    Following the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

429.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

430.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

431.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

432.    Plaintiffs have been harmed as a result of the Old DuPont Transfers.

433.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiffs that have been damaged as a result of the actions described in this Third Amended Complaint.

434.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs seek to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

435.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs also seek to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the Plaintiffs.

436.    Plaintiffs further reserve such other rights and remedies that may be available to them under the UVTA as may be necessary to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged in this Third Amended Complaint.

**FIFTEENTH CAUSE OF ACTION**
**California Civil Code section 3439.04(5)(2016) and Delaware Code tit. 6 Sec. 1305**
**Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger and**
**Subsequent Restructurings, Asset Transfers and Separations**
**(By all Plaintiffs against Old DuPont, New DuPont, and Corteva)**

437.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of

this Third Amended Complaint as if fully set forth herein.

438.    Plaintiffs seek equitable and other relief pursuant to the UVTA against Old DuPont, New DuPont, and Corteva.

439.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

440.    Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

441.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

442.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

443.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

444.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

445.    Plaintiffs have been harmed as a result of the Old DuPont Transfers.

446.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs seek to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

447.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiffs also seek to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the Plaintiffs.

448.    Plaintiffs further reserve such other rights and remedies that may be available to them under the UVTA as may be necessary to fully compensate the Plaintiffs for the damages and injuries they have suffered as alleged in this Third Amended Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a trial of this action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiffs and against Defendants, jointly and severally, as follows:

A.      An award of compensatory damages according to proof;

B.      An award pursuant to California Civil Code § 3334 of the value of the use of Plaintiffs' property for the time of the wrongful occupation, the reasonable costs of repair or restoration of all of Plaintiffs' property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Manufacturing Defendants and Defendant DECRA, and all other damages and remedies allowable under California Civil Code § 3334 and California law;

C.      An award of exemplary and punitive damages according to proof;

D.      An order declaring that Defendants' actions constitute a nuisance and requiring Defendants to take such action as is necessary to abate the public nuisance, to take such action as is necessary to ensure that the PFAS that contaminate the aquifers supplying water to the Plaintiffs' public water systems do not present a risk to the public, and to award damages to the Plaintiffs caused by the nuisance;

E.      An order declaring that Defendants are financially responsible for abating actual or threatened pollution or PFAS contamination of groundwater resources, including the aquifer within Plaintiffs' Contaminated Wells;

F.      An order that Plaintiff is entitled to avoid the Chemours Transfers to Old DuPont to the extent necessary to satisfy Plaintiffs' claims;

G.      An order that Plaintiff is entitled to avoid the Old DuPont Transfers to New DuPont and Corteva to the extent necessary to satisfy Plaintiffs' claims;

H.      An order appointing a receiver to take charge of the assets transferred or its proceeds and such other relief the circumstances may require;

I.      An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or

1  other assets that formerly belonged to Old DuPont;

2       J.       An order imposing a constructive trust over any such proceeds for the benefit of the

3  Plaintiffs;

4       K.       An award of Plaintiffs' costs in prosecuting this action, including reasonable

5  attorneys' fees, together with prejudgment interest to the full extent permitted by law; and

6       L.       An award of such other further relief as the Court may deem just and proper.

7  Dated: January 9, 2023                         Respectfully submitted,

8                                                 **SL ENVIRONMENTAL LAW GROUP, PC**

9                                    By:   */s/ Kenneth A. Sansone*
10                                          Kenneth A. Sansone
                                           Seth D. Mansergh
11
12                                         **ROBINSON CALCAGNIE, INC.**

13                                   By:   */s/ Daniel S. Robinson*
14                                          Daniel S. Robinson
                                           Michael W. Olson
15
16                                         **KELLEY DRYE & WARREN LLP**

17                                   By:   */s/ Andrew W. Homer*
18                                          Andrew W. Homer

19                                         ***Attorneys for Plaintiffs***

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all claims and causes of action in this lawsuit.

Dated: January 9, 2023                    Respectfully submitted,

**SL ENVIRONMENTAL LAW GROUP, PC**

By:    */s/ Kenneth A. Sansone*
          Kenneth A. Sansone
          Seth D. Mansergh

**ROBINSON CALCAGNIE, INC.**

By:    */s/ Daniel S. Robinson*
          Daniel S. Robinson
          Michael W. Olson

**KELLEY DRYE & WARREN LLP**

By:    */s/ Andrew W. Homer*
          Andrew W. Homer

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

2

I am over the age of l8, employed in the County of Orange, State of California, and not

3

a party to the within action; my business address is 19 Corporate Plaza Drive, Newport Beach, CA 92660.

4

On January 9, 2023, I served a copy of the foregoing document described as:

5

**THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF AND DEMAND FOR JURY TRIAL**

6

7

on the party or parties named below, by placing a true copy thereof enclosed in sealed envelopes, and sent as follows:

8

**SEE ATTACHED SERVICE LIST**

9

__    **BY FIRST CLASS MAIL as follows**:  I am "readily familiar" with the firm's practice of

10

collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on the same day with postage thereon fully prepaid

11

at Newport Beach. California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage

12

meter date is more than one (l) day after date of deposit for mailing in affidavit. Service by mail was to the parties as stated on the attached service list.

13

____    **BY PERSONAL SERVICE as follows**:  I caused such documents to be served via

14

Personal Service via First Legal Support Services on the offices of the addressees, as stated below.

15

 **X**    **BY ELECTRONIC SERVICE as follows:** I provided the document(s) listed above via

16

email to counsel as stated on the attached service list.

17

____    **BY FEDERAL EXPRESS OVERNITE SERVICES as follows:**  by placing the

document(s) listed above in a sealed envelope and consigning it to an express mail service

18

for guaranteed delivery on the next business day following the date of consignment to the address set forth below.  A copy of the consignment slip is attached to this proof of

19

service.

20

____    **BY FACSIMILE SERVICE as follows**:  by transmitting via facsimile on this date from

21

fax number 949-720-1292 the document(s) listed above to the fax number(s) set forth below. The transmission reported complete and without error. The transmission report,

22

which is attached to this proof of service, was properly issued by the transmitting fax machine. Service by fax was made by agreement of the parties, confirmed in writing. The

23

transmitting fax machine complies with Cal.R.Ct. 2003(3).

24

I declare under penalty of perjury under the laws of the State of California that the

25

foregoing is true and correct.

26

Executed on this 9th day of January 2023, at Newport Beach, California.

27

_Jennifer Rogers_

Jennifer D. Rogers

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

*City of Corona v. 3M Company, et al.*
**Riverside Superior Court Case No.: CVR12100800**

### SERVICE LIST

Christopher M. Murphy, Esq.
WINSTON & STRAWN, LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-7436; Fax: (312) 451-7562
CMMurphy@winston.com

Daniel Aronsohn, Esq.
WINSTON & STRAWN, LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
(213) 615-1834; Fax: (213) 615-1750
daronsohn@winston.com

*Attorneys for Defendant*
*DECRA ROOFING SYSTEMS, INC.*

E. Alex Beroukhim
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
alex.beroukhim@arnoldporter.com

*Attorneys for Defendant*
*THE CHEMOURS COMPANY*
*(as to COA 12-13)*

John Nadolenco, Esq.
Daniel Queen, Esq.
MAYER BROWN LLP
350 S. Grand Ave., 25th Floor
Los Angeles, CA 90071
(213) 229-9500; Fax: (213) 625-0248
dqueen@mayerbrown.com

J. Tom Boer, Esq.
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
(415) 374-2300; Fax: (415) 374-2499
tom.boer@hoganlovells.com

*Attorneys for Defendant, 3M COMPANY*

- 79 -

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Andrew T. Mortl, Esq.
Adam M. Rapp, Esq.
GLYNN, FINLEY, MORTL, HANLEY & FRIEDENBERG LLP
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, CA 94596
(925) 210-2800; Fax: (925) 945-1975
amortl@glynnfinley.com;
arapp@glynnfinley.com

Lanny S. Kurzwell
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry St
Newark, NJ 07102
(973) 639-2044
lkurzweil@mccarter.com

Ira Gottlieb, Esq.
MCCARTER & ENGLISH, LLP
1600 Market St, Suite 3900
Philadelphia, PA 19103
(215) 979-3892
igottlieb@mccarter.com

***Attorneys for Defendants***
***E. I. DU PONT DE NEMOURS AND COMPANY and***
***THE CHEMOURS COMPANY (as to all claims***
***except COA 14-17)***

Paul Murphy, Esq.
Jodi Newberry, Esq.
MURPHY ROSEN LLP
100 Wilshire Blvd., Suite 1300
Santa Monica, CA 90401
(310) 899-3300; Fax: (310) 399-7201
pmurphy@murphyrosen.com
jnewberry@murphyrosen.com

Katherine Hacker, Esq.
John Phillips, Esq.
Joshua Ackerman, Esq.
BARTLIT BECK LLP
1801 Wewatta, Suite 1200
Denver, CO 80202
(303) 592-3141
kat.hacker@bartlitbeck.com
john.phillips@bartlitbeck.com
josh.ackerman@bartlitbeck.com
dupont@bartlitbeck.com

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  Kate Roin, Esq.
2  BARTLIT BECK LLP
   54 W. Hubbard St., Suite 300
3  Chicago, IL 60654
   (312) 494-4440
4  kate.roin@bartlitbeck.com

5  **_Attorneys for Defendants,_**
   **_E. I. DUPONT DE NEMOURS AND COMPANY_**
6  **_(as to COA 12-15); DUPONT DE NEMOURS, INC._**
   **_and CORTEVA, INC._**
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF